Max Levine and Pennie Levine v. Commissioner. Jacob Dubrovsky and Gertrude Dubrovsky v. Commissioner.
Levine v. Commissioner
Docket Nos. 89911, 89912.
United States Tax Court
T.C. Memo 1962-68; 1962 Tax Ct. Memo LEXIS 240; 21 T.C.M. (CCH) 363; T.C.M. (RIA) 62068; March 28, 1962
*240 1. Held, that of the sum of $35,000 which was paid by the purchaser to the sellers for a fuel oil business over and above the value of the physical assets sold, 50 percent was paid for the goodwill of the sellers and is taxable as long-term capital gain and 50 percent was paid for a covenant by the sellers that they would not compete for a period of 7 years and is taxable as ordinary income. 2. Held, that "All oil burner supplies, parts and tools" included in the sale were "property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year." The gain from such sale is taxable as ordinary income as the Commissioner has determined and not as long-term capital gain as petitioners contend. Martin D. Cohen, Esq., for the petitioners. Gerald N. Daffner, Esq., *241 for the respondent. BLACK Memorandum Findings of Fact and Opinion These proceedings have been consolidated. The Commissioner has determined deficiencies in petitioners' income tax for the calendar year 1956 as follows: Docket
No.
Petitioners
Deficiency
89911
Max Levine and Pennie
Levine
$2,127.90
89912
Jacob Dubrovsky and Ger-
trude Dubrovsky
3,096.01 The deficiency in each case is due mainly to one adjustment made by the Commissioner to the net income reported by petitioners in their joint returns for 1956. That adjustment was to determine that the gain which the partnership of Economy Oil & Supply Co. realized from the sale of part of its assets resulted in ordinary income and not capital gains as petitioners had treated it on their returns for 1956. There is another adjustment whereby the Commissioner determined that the price received from the sale of certain supplies consisting of tools, oil burner supplies, etc. did not represent capital assets within the meaning of section 1221, 1954 Code, and therefore the gain from the sale of such assets was ordinary income. The amount received from the sale of such assets respondent determined *242 to be $2,500. Petitioners by appropriate assignments of error contest the correctness of these two adjustments. Petitioners, in their amended petitions, raise an alternative assignment of error which is in substance that if we should hold against them on the main issue, then no income was realized by petitioners in 1956 for the reason that a purchase money mortgage in the face amount of $35,000 given to petitioners in 1956, both cash basis taxpayers, had no ascertainable fair market value at any time during the taxable year 1956. Findings of Fact Many of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Max and Pennie Levine are husband and wife, residing in the Township of Lakewood and County of Ocean, New Jersey. Jack (Jacob) and Gertrude Dubrovsky are husband and wife, residing in the Borough of Farmingdale, Monmouth County, New Jersey. For the year 1956 each set of petitioners filed a joint Federal income tax return with the district director of internal revenue, Camden, New Jersey. Max and Jack will sometimes hereinafter be referred to as petitioners. Between September 5, 1946, and *243 March 21, 1953, Economy Oil & Supply Corp., a New Jersey corporation, sometimes called the old corporation, was engaged in the business of selling gasoline, fuel oil, and kerosene, together with related products and services. Such business was conducted from premises located in the Township of Howell in Monmouth County. All of the old corporation's outstanding stock was held by David Schwartz and Jerome Schurgin. The physical assets of the old corporation consisted primarily of the land and building in Howell from which the business was conducted, a number of trucks, several storage tanks, an inventory of gasoline, fuel oil and related petroleum products, office furniture and equipment, and tools and supplies used in the business of selling such products and rendering related services. Sometime prior to March 1953, petitioners learned that the business of the old corporation was for sale and entered into negotiations with Schwartz and Schurgin, its owners, for its purchase. Petitioners' sole previous business experience concerned raising poultry. Jack was a feed salesman and also had a small poultry farm. Max owned a chicken hatchery and a poultry farm. On March 21, 1953, the old *244 corporation, acting through Schwartz and Schurgin, agreed in writing with Jack and Max to sell the Economy fuel oil business, including various physical assets relating thereto, for $50,000, subject to certain adjustments not here material. The transaction was consummated on April 2, 1953, with the execution of a series of documents and instruments. In addition to the conveyance to Jack and Max of the land, building, trucks, tanks, liquid inventory, and other physical assets used by the old corporation in connection with its fuel oil business, Schurgin and Schwartz, as individuals, executed a covenant dated April 2, 1953, wherein they agreed not to compete in the fuel oil business for 7 years within a radius of 25 miles of the business property in Howell, New Jersey. Schwartz and Schurgin, in addition to their individual covenants not to compete, caused a corporation owned by them known as "Economy Tire & Recapping Corp." to execute a covenant which provided that certain adjacent premises owned by Economy Tire & Recapping Corp. would at no time "be used or occupied for the sale of fuel oil, kerosene, gasoline or motor oil except that which may be sold at retail in a service station *245 located on said premises." Title to the land and building in Howell on which Economy Oil had conducted its business was conveyed to Max and Jack as tenants in common. Following their purchase, petitioners formed a partnership under the trade name of Economy Oil & Supply Co., hereinafter referred to as the partnership. The assets purchased by petitioners were carried as assets of the partnership on the partnership books. At all times herein material the partnership has maintained its books of account and filed U.S. partnership returns of income (Form 1065) on the basis of a calendar year using the accrual method of accounting. The principal business activity of the partnership from March 21, 1953, until November 30, 1956, involved the sale at wholesale and retail of gasoline, antifreeze, motor oil, diesel oil, and other related products for automotive purposes, the sale at wholesale and retail of fuel oil, kerosene, diesel oil for the operation of oil burners, and the sale of oil burners, air-conditioning equipment, and other parts or equipment connected with the operation of the oil burners. The partnership operated the fuel oil business until November 30, 1956. During the period *246 from April 1953 through November 1956, there was very little turnover in the fuel oil customers which the partnership had inherited from the old corporation. Approximately 4 or 5 percent of the customers served by the old corporation were dropped by the partnership chiefly due to the poor credit performance of this small group of customers. There were also a few additions of customers from time to time, but in the main the list of customers was the same from year to year. The nature of the fuel oil business is such that the principals or owners of such a business have little direct contact with customers. In the case of Max, he continued to concern himself with his chicken hatchery and poultry farm until the spring of 1956. Jack operated Economy and drew a salary for these services; Max drew no salary. Petitioners themselves rarely made deliveries of oil to customers and at no time made repairs or serviced oil burners. In the latter part of the summer of 1956, petitioners were faced with the problem of laying in large stocks of fuel oil to meet the demands of customers which typically become heavy in the fall. Slow collections from the partnership's customers confronted petitioners *247 with the problem of raising money to pay their oil suppliers. For this reason petitioners considered selling their fuel oil business. They intended, however, to retain the gasoline business which was as yet relatively small. As the first step in their efforts to sell their fuel oil business, petitioners placed an ad in the classified section of a prominent New York City newspaper. One of the inquiries which petitioners received respecting the ad was from Samuel W. Katz. Jack telephoned Katz who agreed to meet with petitioners at Economy's office in Howell, New Jersey. From the time of Katz's first meeting with petitioners until the final consummation of the sale of the fuel oil business to Katz on November 30, 1956, 10 or 12 conferences were held. Some of these meetings took place at Economy's office in Howell and some were held at the office of Katz's attorney. During the course of the first meeting between petitioners and Katz, Jack stated that he and Max were asking $85,000 for Economy's fuel oil business. Petitioners had determined that the physical assets associated with Economy's fuel oil business had an aggregate value of $50,000. It was their belief that the goodwill of *248 Economy was worth $35,000. It had sold to customers in the year before approximately 1,200,000 gallons of fuel oil. Katz did not immediately agree to pay $85,000 for petitioners' fuel oil business stating that he would have to think the matter over and consult with his accountant. Sometime in September 1956, Katz determined to buy petitioners' business for $85,000. Katz thereupon formed M & O Economy Oil Co., Inc., a New Jersey corporation, to become the purchaser of the fuel oil business of the partnership, Economy Oil & Supply Co. At all times material Katz has been the owner of all outstanding stock in the new corporation, as well as its manager and president. At no time during the negotiations between petitioners and Katz did any bargaining or "give and take" as to price take place. Katz made it plain, however, that he would not purchase at the price of $85,000 unless petitioners would agree to a covenant not to compete in the fuel oil business for a period of 7 years; petitioners readily agreed that they would execute such a covenant. During one of the meetings held at the office of Katz's attorney a suggestion was made by Katz's accountant that the purchase price be broken down *249 so that he could set up values on the books of the new corporation. The values proposed by the accountant for allocation were as follows: Land
$ 5,000.00
Buildings
8,500.00
Tanks
18,000.00
Office Furniture
2,000.00
Trucks
14,000.00
Restrictive Covenants
35,000.00
Supplies
2,500.00
$85,000.00
The matter of allocating portions of the agreed purchase price to specific assets was temporarily tabled to permit petitioners to consult their accountant. Max was advised by his accountant that the breakdown made no difference to petitioners since the purchaser could treat the matter as he wished on his books without binding petitioners as to their treatment of the transaction. Katz's accountant was present at the negotiations between Katz and petitioners regarding the sale of Economy's fuel oil business and he was aware of the income tax consequences flowing from the allocation of a dollar amount to a covenant not to compete in connection with such a sale. The various agreements between Katz and petitioners relating to the sale of petitioners' fuel oil business to the new corporation were embodied in an agreement which had been prepared by Katz's attorney *250 and which was executed by petitioners and Katz on October 30, 1956. It is Exhibit 7-G to the stipulation and consists of 18 pages, together with certain schedules attached thereto. The October 30 agreement provided, among other things, that petitioners would sell their fuel oil and kerosene business, including real estate, equipment, fixtures, motor vehicles, goodwill, and trade name "Economy Oil & Supply Co." to a newly organized corporation which Katz had organized for $85,000 and certain mutual covenants. The agreement reads in part as follows: 2. The "Seller" will transfer and assign all of the good will of the fuel oil and kerosene and diesel oil (except as hereinafter provided) of the business of the "Seller" including the trade name of Economy Oil & Supply Co. and with regard to the trade name certificate filed, the "Sellers" will cause the same to be discharged simultaneously with the filing of a new certificate by the "Purchaser" or its assigns. 3. The "Sellers," Jack Dubrovsky and Max Levine, jointly and severally do hereby covenant, promise and agree to and with the said M & O Economy Oil Co., Inc. its successors and assigns, that they and each of them will not within *251 seven years from the date of the consummation of this transaction (this covenant to be set forth in separate instrument attached to the Bill of Sale hereinafter to be given) either solely or jointly with or as agent for any person or persons, association or associations, corporation or corporations, either as director, officers or stockholders of any corporation (except that said "Sellers" may own stock in any corporation listed on the New York Stock Exchange or the American Stock Exchange) directly or indirectly, carry on, engage in, or be interested in any manner in the carrying on, within the area of 40 miles of the premises described in Schedule "A" attached hereto and made a part hereof, the business of the sale, at wholesale or retail, of fuel oil, kerosene, diesel oil (except the "Seller" may sell diesel oil for use in automobiles or automobile trucks) or buying and selling any of such fuel oil, kerosene or diesel oil (except as aforesaid) and said "Sellers" or either of them will not within 7 years of the date of consummation of this transaction and within an area of 40 miles of the premises described in Schedule "A" aforesaid, enter into the retail or wholesale business of *252 oil burner * * * service or oil burner equipment, air conditioning equipment, or any parts or equipment connected with or necessary in the operation of oil burners. * * *
17. The parties hereto agree that in computing the purchase price, the following valuations have been fixed by the parties hereto: Land
$ 5,000.00
Buildings
8,500.00
Tanks
18,000.00
Office Furniture
2,000.00
Trucks
14,000.00
Restrictive Covenants
35,000.00
Supplies
2,500.00
The above valuations and allocations embodied in the agreement were suggested by the purchaser's accountant and insisted upon by Katz. At the closing of the purchase and sale on November 30, 1956, a series of documents was executed, including the following: (a) A bill of sale from petitioners to the new corporation containing a covenant not to compete, a schedule listing assets being transferred including trucks, tanks, furniture, as well as "The trade name Economy Oil and Supply Co." and "Good will of Economy Oil and Supply Co." The bill of sale also contains a provision which reads: "All oil burner supplies, parts and tools." (b) A deed conveying to the new corporation the land and building from which *253 Economy's fuel oil business was operated. (c) A chattel mortgage running from the new corporation to petitioners in the face amount of $35,000, forming a lien on certain trucks, tanks, and furniture. On its Federal income tax returns for the taxable period ended September 30, 1957, and the fiscal years ended September 30, 1958 and 1959, the new corporation claimed deductions based on amortization of $35,000 which it claimed it had paid for "restrictive covenants." Respondent having disallowed such deductions, the new corporation paid additional income taxes and its suit for refund is now pending in the United States District Court for the District of New Jersey. We find as an ultimate fact that of the amount of $35,000 which Katz and his corporation paid to petitioners over and above the amount of $50,000 which was paid to petitioners for the land and physical assets of the partnership, 50 percent thereof was paid to petitioners for the goodwill of the partnership, Economy Oil & Supply Co., and 50 percent was paid for the covenant not to compete which was entered into by them at the time of the sale. The oil burner supplies, parts, and tools were included in the contract of *254 sale at an amount of $2,500. It was agreed, however, that if at the time of closing there was less than $2,500 of oil burner supplies, parts, and tools, petitioners were to pay or allow to the purchasing corporation the difference between the cost price of the oil burner supplies, parts, and tools on hand and the sum of $2,500. At the time of closing, this amount of $2,500 was reduced by the parties by $823 under the above provision of the contract. Opinion Issue 1 BLACK, Judge: It is the contention of petitioners that all of the $35,000 which we have described in the Findings of Fact was paid for the goodwill of the fuel oil and kerosene business which they, as a partnership, were operating under the name of Economy Oil & Supply Co. Their contention is based upon the fact that in the year prior to the year of sale the partnership sold 1,200,000 gallons of fuel oil and that the good will of the business was measured, according to custom, by 3 cents per gallon of fuel oil sold. On the other hand, it is the contention of respondent that the $35,000 was paid to petitioners for their covenant not to compete. Petitioners and respondent have each in their briefs discussed many cases *255 which have dealt with this subject. We do not think there would be any advantage to take up and discuss in detail these cases and their respective holdings. Suffice it to say that we have carefully read these several cases and the briefs of both parties. When we consider all the facts in the instant case we do not think it is accurate to say that all of the $35,000 was paid for the goodwill of the partnership, Economy Oil & Supply Co., as petitioners contend. On the other hand, we do not think it would be accurate to say that nothing was paid for the goodwill but that the $35,000 was paid for the covenant not to compete, as respondent contends. We think what we said in Rodney B. Horton, 13 T.C. 143 (1949), is applicable here. In discussing that case we said at p. 148: In the instant case we have found, after a consideration of all the facts, that the percentage payments which were to be made under the contract are severable as between good will and the covenant not to compete and that 50 per cent of such payments was made in consideration of good will transferred and 50 per cent was made in consideration of the covenant not to compete for a period of six years from *256 October 1, 1941. We have made a finding of fact herein based on all the evidence in the record that 50 percent of the $35,000 in question is to be attributed to the goodwill of the fuel oil business which was sold by the partnership to the newly organized corporation, M & O Economy Oil Co., Inc., and 50 percent is to be attributed to the covenant not to compete for a period of 7 years. The 50 percent attributed to the sale of goodwill will be treated as long-term capital gain and the 50 percent attributed to the covenant not to compete will be treated as ordinary income in a computation under Rule 50. Having thus held, it is unnecessary to consider the alternative contention made by petitioners. They only urged that contention, as we understand their brief, in the event we should hold against them in its entirety on Issue 1. Issue 2 Petitioners contend that whatever profit there was from the sale of "All oil burner supplies, parts and tools" should be treated as long-term capital gain. Respondent contends that it should be treated as ordinary income. The deficiency notice treats the amount received for these articles as being $2,500. It is true that amount was allocated to *257 these articles in the original sales agreement but on the final closing, November 30, 1956, the amount of $2,500 was reduced by $823. Therefore, respondent erred in treating the amount received for these articles as being $2,500. The question is, should the gain from these articles be treated as long-term capital gain as petitioners contend or as ordinary income as respondent contends. Section 1221, I.R.C. 1954, reads in part as follows: Sec. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; From the evidence in the case we think the items in question "would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year." We sustain respondent's contention that whatever income there was *258 from the sale of "All oil burner supplies, parts and tools" would be taxable as ordinary income. Petitioners in their brief concede that respondent correctly adjusted partnership income by disallowing "(a) expenses paid for professional services in the amount of $838.23, and (b) miscellaneous repair expenses in the amount of $330." Effect will be given to these concessions under Rule 50. Decisions will be entered under Rule 50.