Howard G. Mathews and Martha I. Mathews v. Commissioner.
Mathews v. Commissioner
Docket No. 84013.
United States Tax Court
T.C. Memo 1961-304; 1961 Tax Ct. Memo LEXIS 47; 20 T.C.M. (CCH) 1565; T.C.M. (RIA) 61304; October 31, 1961
*47 Martin L. Haines, Esq., for the petitioners. Stephen P. Cadden, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for 1956 in the amount of $8,470. The only issue for decision is whether an amount of $20,000, which was stated in an agreement involving a sale of the business of Packers Express, Inc., to be for one of petitioners' refraining for a period of 3 years from engaging in the trucking business within the territory in which the business sold was to operate, constituted ordinary income as determined by respondent or capital gains as reported by petitioners. Findings of Fact Petitioners are husband and wife, who, at the time of filing their 1956 Federal income tax return, resided at Glassboro, New Jersey. They filed a joint Federal income tax return for the year 1956 with the district director of internal revenue at Camden, New Jersey. Howard G. Mathews (hereinafter referred to as petitioner) and his wife, Martha I. Mathews, in 1956, owned 90 percent of the stock of Packers Express, Inc. (hereinafter referred to as Packers Express). Packers Express was organized *48 by petitioner in 1953 and was incorporated under the laws of the State of New Jersey. Packers Express purchased its certificate of operation from Refrigerated Dispatch of Cleveland, Ohio after petitioner had foreclosed a mortgage he had on the assets of that company. In 1953 petitioner had 23 years of experience in the refrigerated trucking business. Petitioner was president and general manager of Packers Express and was in actual control of its business operations. Packers Express was engaged in the interstate transportation by trucks of meats, meat products, frozen food, and vegetables. Petitioner was personally responsible for setting up terminals for Packers Express and for obtaining its customers. Petitioner, at the time he organized Packers Express, knew many of the persons who shipped products requiring refrigeration well enough that he was able to transact business with them by telephone. When a terminal would be set up in a new location, petitioner would take the manager he had selected for that terminal to meet personally the persons who would be the prospective customers of Packers Express. In 1954 Packers Express reported a net income of $10,515.92 out of gross operating *49 revenues of $783,690.14; in 1955 it reported a net income of $942.59 out of gross operating revenues of $1,079,045.04; and in 1956 it reported a net loss of $789.25 out of gross receipts of $418,117.25. In 1955 petitioner informed a number of persons that he would be willing to sell Packers Express for $100,000. In early 1956 George Oliver, whom petitioner had known for several years, informed petitioner that he knew someone who might be interested in purchasing Packers Express. Oliver arranged for petitioner to meet E. J. Garmhausen. Garmhausen and petitioner discussed the possible sale of Packers Express. Petitioner informed Garmhausen that he would take $100,000 plus an additional amount for any office equipment that Garmhausen wished to take over for the business of Packers Express, with the understanding that Garmhausen would take over the conditional sales contracts on Packers Express' equipment. Arrangements were made for Garmhausen to look over the books of shipments and waybills of Packers Express. At this point there was no discussion between petitioner and Garmhausen concerning a covenant by petitioner not to compete. Petitioner advised Garmhausen that after selling Packers *50 Express he intended to go to North Carolina and go into the trailer business. The rolling equipment of Packers Express which was sold to Garmhausen consisted of six 1954 Brown trailers, one Reo tractor, and one Trailmobile trailer. On the corporate income tax return of Packers Express for 1956, there were shown six 1954 Brown trailers acquired on April 4, 1955, with a cost or other basis of $51,000, depreciation previously allowed or allowable of $7,200 and a remaining basis of $43,800; one Trailmobile trailer acquired January 25, 1956, at a cost or other basis of $3,001 with no depreciation allowed in prior years; and two Reo's acquired July 21, 1955, at a cost or other basis of $11,569.54 with depreciation allowed or allowable in prior years of $733.60 and a remaining cost or other basis of $10,835.94. The amount due on this equipment under conditional sales contracts as of April 1956 was in the total amount of a little over $35,000. In arriving at the price to be asked for the business of Packers Express petitioner did not assign to the rolling equipment any value in excess of the liens against it. Petitioner and Garmhausen both realized that it would be necessary to obtain *51 approval of the ICC for the sale by Packers Express to Garmhausen of its operating certificates. Petitioner was unwilling to sell unless the approval of the ICC for the sale could be obtained without the necessity of a formal hearing which he felt might delay the sale for a year or two. When petitioner and Garmhausen had arrived at an agreement as to the sales price of Packers Express, they went to Washington to discuss with officials of the ICC the purported sale of the operating certificates. They were accompanied in their visit to the ICC by a lawyer who had previously represented Garmhausen before the ICC. During these informal discussions the officials of the ICC stated to petitioner and Garmhausen that the price for the franchise was too high. After the conference with officials of the ICC petitioner and Garmhausen and the attorney representing Garmhausen discussed further an agreement for the sale of the business of Packers Express. As a result of these discussions petitioner and Packers Express entered into an agreement with Garmhausen dated April 10, 1956, which provided in part as follows: AGREEMENT made the 10th day of April 1956 between PACKERS EXPRESS INC., a corporation *52 of the State of New Jersey and HOWARD G. MATHEWS, owner of all of the issued and outstanding stock, jointly hereinafter referred to as Sellers and E. J. GARMHAUSEN or nominee of Sidney, Ohio, hereinafter referred to as Buyer. WITNESSETH that for and in consideration of the sum of $1.00 each to the other in hand paid, receipt whereof is hereby mutually acknowledged, the parties hereto agree as follows: FIRST: Sellers agree that they will sell, set over, transfer and assign to Buyer or his nominee, * all their right, title and interest in and to the certificates heretofore granted Packers Express Inc. by the Interstate Commerce Commission in Dockets MC-101563 and all sub numbers thereunder, together with any good will and business presently performed by them under such certificates, for the sum of $30,000.00. * * *
FIFTH: Sellers agree that for an additional sum of $51,000.00 they will set over, transfer and assign to the buyer or his nominee, all of the office furniture, fixtures, automotive equipment parts, tools, accessories and supplies heretofore used in, about or in connection with the business conducted by Packers *53 Express Inc., whether situate on the premises occupied by said firm or elsewhere and including those items specifically listed and described on Exhibit A attached hereto and made a part hereof, but not limited thereto; except, however, one 1956 Imperial automobile, and one 1955 Chevrolet pickup truck and real estate located at 210 Oak Avenue in Barrington, New Jersey, one 1955 Reo tractor, three mahogany desks, one mahogany table, three leather covered chairs, two secretarial chairs, one metal storage cabinet, one four drawer filing cabinet, one check writer, one Friden calculator, one National Cash Register bookkeeping machine with all trays and attachments thereto, one adding machine, one mahogany cabinet and one swivel leather chair. Sellers, jointly and severally, warrant that they have good title to said property and full right to sell and convey the said and that the same is free and unencumbered save and except for the sum of $35,640.00 due the Old Kent State Bank and the sum of $5652.61 due the First Camden National Bank and Trust Company, for a total obligation of $41,292.61 as of March 29, 1956, which buyer assumes and agrees to pay as part consideration for the purchase *54 price. Any monies paid by Sellers on said accounts reducing the indebtedness, shall be given Sellers at the closing of this transaction in addition to the other considerations herein provided. * * *
SEVENTH: Howard G. Mathews agrees that for the sum of $20,000.00 he will refrain from engaging in the trucking business, either directly or indirectly, for a period of three years from the date of consummation of this transaction, within the territorial operations as described in the said certificates. EIGHTH: Both parties agree that a deposit of $10,000.00 shall be placed with the Huntington National Bank of Columbus, Ohio, to be held in escrow by it until the transfer of the Certificate has been approved by the Interstate Commerce Commission. The balance of $91,000.00 shall be accepted by the sellers with the said deposit of $10,000.00 as full and complete satisfaction. NINTH: Buyer agrees to purchase the Interstate Commerce Commission Certificate of the sellers together with the business, good will and office furniture, fixtures, and automotive equipment as above described and listed on Exhibit A attached hereto and made a part hereof, as well as for the said restrictive covenant *55 of Howard G. Mathews not to engage in the trucking business for three years and pay therefor the said sum of $101,000.00 in the manner as hereinabove set forth. TENTH: Both parties agree that should the Interstate Commerce Commission not approve the transfer of the Certificate within 60 days from the date hereof, then the deposit shall be refunded to the Buyer and when the same has been done, there shall be no further obligation running from either party to the other. * * *
IN WITNESS WHEREOF, both parties hereunto have set their respective hands and seals the day and year as above written. Witness: Lois Nolte Barbara Tiehms E. J. Garmhausen, Buyer Howard G. Mathews, Seller PACKERS EXPRESS INC. Howard G. Mathews, President, Seller Attest: Theresa Jannowitz, Asst. Sec. This agreement was made a part of a sworn application to the ICC for the transfer of the certificates from Packers Express to Garmhausen or his nominee. The transfer was approved by the ICC in June of 1956. After approval was obtained, settlement was had between petitioner and Packers Express, as sellers, and Garmhausen, as buyer, and Coldway Food Express Inc., as nominee, and the following *56 settlement statement was prepared: SETTLEMENT STATEMENT
E. J. Garmhausen, Buyer
Coldway Food Express, Inc., Nominee
Howard G. Mathews, Seller
Packers Express, Inc., Seller
AGREEMENT OF APRIL 10, 1956
Item
1. Covenant not to compete
$ 20,000.00
2. Interstate Commerce Commission - Permit and Goodwill
30,000.00
3. Office Equipment
2,000.00
4. Trailmobile Trailer
2,000.00
5. 6 Trailers and 1 Reo Tractor
86,256.93
6. Total Sales Price
$140,256.93
Cash: 7. May 1, 1956, personal check of E. J. Garmhausen (de-
posited in escrow fund in Columbus, Ohio, Bank)
$10,000.00
8. June 22, 1956, cashiers' check purchased by Coldway
Food Express, Inc., from bank in Sidney, Ohio
94,850.35
9. Total Cash
$104,850.00
[.35]
Mortgages Assumed: 10. Old Kent State Bank
$30,780.00
11. Camden National Bank (Trailmobile)
1,748.97
12. Camden National Bank (Other liens)
2,877.61
13. Total Mortgages Assumed
35,406.58
14. Total Consideration
$140,256.93
After the settlement petitioner wrote a letter to all of the customers of Packers Express advising them of the sale to Coldway Food Express, Inc. He *57 stayed on with Coldway Food Express, Inc., for a period of about 2 weeks. Coldway Food Express, Inc., took over the same offices and same telephones previously used by Packers Express and the transition was an easy matter with no interruption of business. At the time of the financial settlement petitioner did not execute any separate covenant or agreement not to compete with Garmhausen or Coldway Food Express, Inc., in addition to the statement contained in the agreement of April 10, 1956, heretofore set forth. The increase in the amount from $100,000 to $104,850 was due to Garmhausen's taking certain office equipment and to certain payments which had been made on equipment between the date of the contract and the closing in June of 1956. Two checks, one for $10,000, the other for $94,850, were drawn to the order of Packers Express and on the instructions of petitioner were deposited to the account of Mobilmanor Corporation. Mobilmanor Corporation was a new corporation formed by petitioner to operate a house trailer business. It operated from Lenoir, North Carolina. Packers Express was liquidated in 1956 and at petitioner's direction the assets which had not been sold under *58 the agreement of April 10, 1956, were transferred to Mobilmanor Corporation. Mobilmanor Corporation subsequently became bankrupt. There is now pending in the United States District Court for the District of New Jersey a suit instituted by Coldway Food Express, Inc., against petitioner relative to an alleged violation of the provision of the agreement of April 10, 1956, that petitioner would refrain from engaging in the trucking business within certain territories. Petitioners, on their income tax return for 1956, reported a long-term capital gain of $75,555.43 from the liquidation of Packers Express. This gain represented the difference between an amount of $124,556.65 listed as gross sales price and $49,001.22 listed as basis. Respondent, in his notice of deficiency, determined that $20,000 of the amount received was ordinary income with the following explanation: (a) It has been determined that the amount of $20,000 which you received in 1956 is taxable as ordinary income since it was paid to you as consideration for a covenant not to compete with the purchaser of the principal assets of Packers Express, Inc. The aforementioned amount does not represent proceeds of sale of *59 a capital asset. Opinion Where a corporate business is sold and in conjunction therewith an amount, separately negotiated for between the parties, is paid in consideration of the stockholders' agreeing to refrain from entering a competing business for a specified period, the amount so paid is ordinary income to the stockholders whether paid directly to them or paid to the corporation by which it is distributed to them. (C.A.D.C., 1934). However, where the covenant not to compete is made in connection with the sale of a going business, and is primarily for the purpose of assuring to the purchaser the beneficial enjoyment of the goodwill which he has acquired, the covenant is regarded as nonseverable and in effect merely a contributing element to the assets acquired. and cases there cited. Petitioner contends that the covenant not to compete which he gave to the purchasers of the assets of Packers Express was not severable from the sale of the corporate business, was not separately bargained for between the parties, and was assigned a value only to reduce the stated sales price of the *60 operating certificates to an amount which would assure approval of the transfer of these certificates by the ICC. The evidence shows that the only written agreement between the parties was that of April 10, 1956. This agreement specifically provided that petitioner, for the amount of $20,000, agreed not to engage in the trucking business in the territory covered by the operating certificates being transferred. This agreement formed a part of the sworn application of petitioner to the ICC for approval of the transfer of the certificates: * * * When the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration. (C.A. 2, 1959), affirming . No such strong proof is present here. The evidence shows that petitioner personally was experienced in the refrigerated trucking business and was well acquainted with persons shipping refrigerated products, but there is no showing that Packers Express, an entity separate from petitioner, had any goodwill *61 other than that attaching to its operating certificates. Upon the sale of the assets of Packers Express, petitioner wrote its customers to advise them that the operations of that company had been taken over by another corporation and stayed with the new corporation for about 2 weeks to assist it in commencing its business. This assistance to the purchaser was a personal service rendered by petitioner and his agreement not to enter the trucking business in the area covered by the certificates sold by Packers Express was an assurance that similar personal services would not be rendered by petitioner to another. The case of , affd. (C.A. 9, Aug. 28, 1961), relied on by petitioner, involved the sale of a partnership interest. In that case the partnership had substantial goodwill which the seller had included in his offering price. The purchasers, however, persuaded him to word the agreement in terms of a covenant not to compete because of the tax benefit they were informed they would obtain thereby. The covenant was for 1 year, and it would have been difficult if not impossible for the seller to have entered a competing *62 business within that time because of his inability to obtain machinery during the Korean conflict. It was also known to the purchasers that petitioner was selling his partnership interest because of his intention to enter another business. There existed no actual value to the seller's covenant not to compete in , but the partnership had developed goodwill of a substantial value during the time it had been in business. The sales agreement in the present case specifically recites that the sale price of the operating certificates together with goodwill and business presently performed by sellers under such certificates is $30,000. The evidence is insufficient to show that this amount did not fairly represent the value of these certificates together with any goodwill of the business. Since the assets that were being sold were the corporate assets of Packers Express, the only goodwill which could be included in such sale was that of the corporation. Cf. . If petitioner had any personal goodwill, his agreement not to use it to compete with the purchaser of the business of Packers Express was not a part *63 of the transferred assets of Packers Express. Petitioner argues that his covenant not to compete had no value since he could not compete without a certificate from the ICC, but the record is totally devoid of any evidence of what other companies, if any, there were operating in the area covered by the certificates sold by Packers Express by whom petitioner might have been employed. Petitioner agreed not to compete directly or indirectly. There is no evidence to show that petitioner could not have obtained a certificate covering the same area as the one sold by Packers Express. Petitioner had many years of experience and wide acquaintance in the trucking business. A person of his experience in this field could create real competition for a new company. This indicates that his covenant not to compete had a value independent of any goodwill of Packers Express. The purchaser of the assets of Packers Express must have attached importance to the petitioner's covenant not to compete. There is currently pending a suit by the purchaser against petitioner in connection with this covenant. The purchaser was aware that petitioner intended to go into the house trailer business in North Carolina. *64 The evidence does not show whether the purchaser knew that petitioner had no prior experience in this business. In any event, the buyer had no assurance that petitioner would remain in such business over the 3-year period of the covenant. In , relied on by petitioner, the facts were that a value was assigned in a second draft of the sale contract to the covenant not to compete only for the purpose of ameliorating the tax consequences for the buyer. The evidence in the instant case discloses that the details of the sales agreement had not been worked out between petitioner and the buyer until after the conference at the ICC. The only agreement which was drafted insofar as this record shows was that of April 10, 1956. Petitioner argues that the agreement of April 10, 1956, placed an excessive value on the rolling equipment and that this fact indicates that the allocations in the agreement served no real purpose. The evidence of the value of the rolling equipment is far from satisfactory, but even if the fact that the value placed thereon was excessive has been established, it would not indicate that the value placed on the covenant not to compete *65 was not a true value. In (C.A. 10, 1954), affirming , the court stressed the fact that in the transaction there under consideration the sale was of stock and that no title to the property or assets of a going concern passed from one ownership to another. In the instant case the sale of the going concern was by Packers Express and the covenant was a personal agreement of petitioner. This covenant was severable from the other provisions of the contract in which it was contained. This contract was signed by petitioner in his individual capacity as well as his capacity as president of Packers Express. We sustain respondent in his determination that the $20,000 allocable to the covenant not to compete was ordinary income to petitioner. Decision will be entered for respondent. Footnotes
*. Coldway Food Express Inc. has been nominated.↩