378 F.2d 771
 67-1 USTC P 9423
 COMMISSIONER OF INTERNAL REVENUE, Petitioner,
v.
Carl L. DANIELSON and Pauline S. Danielson, Respondents,
COMMISSIONER OFINTERNAL REVENUE, Petitioner, v. Helen P.
SHERMAN, Respondent, COMMISSIONER OFINTERNAL REVENUE,
Petitioner, v. ESTATE of Jacob F. SCHAFFNER, Deceased,
Elizabeth Schaffner and Erwin Marsch, Executors, and
Elizabeth Schaffner, Respondents, COMMISSIONEROF INTERNAL
REVENUE, Petitioner, v. Hugh E. McLENNAN and Katherine
McLennan,Respondents.
 Nos. 15826-15829.
 United States Court of Appeals Third Circuit.
 Argued Sept. 16, 1966, Reargued Dec. 20, 1966.
Decided May 2, 1967.
 
 Stephen H. Paley, Dept. of Justice, Tax Division, washington, D.C. (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Attys., Dept. of Justice, Washington, D.C., on the brief), for petitioner.
 Sidney B. Gambill, Pittsburgh, Pa. (Charles C. Cohen, Reed, Smith, Shaw & McClay, Linn V. Phillips Jr., Neely, Stockdale & Phillips, Pittsburgh, Pa., on the brief), for respondents.
 Before STALEY, Chief Judge, and McLAUGHLIN, KALODNER, HASTIE, SMITH, FREEDMAN and SEITZ, Circuit Judges.
 OPINION OF THE COFURT
 SEITZ, Circuit Judge.
 
 
 1
 This is the decision on various petitions of the Commissioner of Internal Revenue to review a decision of the Tax Court of the United States determining the tax treatment of certain payments which were recited in certain covenants not to compete to be the consideration for such covenants. That court decided that the amount explicitly allocated as payment for each selling stockholder's covenant not to compete should not, for tax purposes, by treated as having been received for such covenants. The correctness of this ruling under the particular facts is of ever-increasing concern because of the frequent use of such covenants in connection with the sales of businesses.
 
 
 2
 The taxpayers[1] were stockholders in Butler County Loan Company ('Loan'), which was engaged in the small loan business and, through a subsidiary, in the consumer finance and discount budiness in Butler, Pennsylvania. The husband of taxpayer, Helen Sherman, had been its successful manager until his death in 1958. Thereafter, one Shukis was brought in to run the business and the Loan's stock. He later exercised an the Loan's stock. The later exercised an option to buy 10 shares.
 
 
 3
 In 1959, the stockholders decided to solicit offers to purchase what was then a declining business. On November 2, 1959, Thrift Investment Corporation ('Thrift') offered in writing to buy all the common stock of Loan for $374 per share and 'our usual non-compete agreement in the Bulter area'. The amount of Thrift's offer was higher than it would otherwise have been becuase Thrift 'passed on' to the selling stockholders part of the favorable tax benefits which it inferred would accrue to it because the amount paid over and above the actual value of the stock was amortizable.[2]
 
 
 4
 All the stockholders but Shukis accepted Thrift's offer. He notified Thrift that he was exercising his option to buy 90 additional shares. He apparently was willing to sell only if he was treated as holding 100 shares.
 
 
 5
 On the same day that it heard from Shukis, November 5, 1959, Thrift forwarded to the President of Loan copies of the proposed agreement of purchase and copies of the non-competition agreement. The proposed covenant not to compete restrained the stockholders from engaging in the small loan business around Butler, Pennsylvania for approximately six years. However, it permitted them to own stock of any small loan corporation. The agreement contained a blank, which was presumably to be filled in later, representing that part of the total consideration which was to be allocated to the convenant not to compete.
 
 
 6
 Because of Shukis' action, a dispute arose between him and the other stockholders. Nevertheless, the settlement was fixed for November 16, 1959. At that time all the stockholders were present along with representatives of Thrift. All the stockholders except Shukis had one attorney. He had his own counsel present.
 
 
 7
 Thrift made it clear, of course, that the stockholder dispute would not cause it to increase the offering price for all outstanding shares. Thus, the cost of issuing any additional shares to Shukis would have to be shouldered by the other stockholders. Protracted negotiations took place that day between Shukis and the other stockholders. They finally reached a settlement. Thrift thereupon completed the agreements with Shukis and then with the other stockholders, the taxpayers herein.
 
 
 8
 Thrift allocated $152 per share to the covenant not to compete and $222 to the contract for the sale of stock. These figures were inserted in the documents. Some question was then raised by the taxpayers as to the tax treatment they would receive on the $152 per share allocated to the covenant. As found by the Tax Court, the Thrift officials explained that the allocations were to Thrift's tax advantage but they did not tell the stockholders that they (the stockholders) would receive capital gains treatment. Nor did Thrift make any attempt to explain to the stockholders that such amounts would be taxable to them as ordinary income. After a brief discussion with their own attorney concerning the allocation, the stockholders here involved, on the advice of their own counsel, signed the documents. Each payment check from Thrift contained the notation that it represented the consideration for both the sale of the stock and the agreement not to compete.
 
 
 9
 Each taxpayer reported the entire amount received by him as proceeds from the sale of capital assets.[3] The Commissioner disallowed that portion which corresponded to the consideration recited in the covenant not to compete and issued a notice of deficiency. The taxpayers then petitioned for a redetermination of the deficiency. The Tax Court ruled in favor of the taxpayers on the present issue, 44 Tax Court 549 (1965), thus permitting the consideration allocated to the covenants to be taxed at capital gains rates rather than as ordinary income. It found in effect that the taxpayers produced strong proof that the covenants were not realistically bargained for by the parties and that the amounts allocated thereto by Thrift were in reality that part of the purchase price of the stock which represented a premium on corporate receivables.
 
 
 10
 The Commissioner filed these petitions for review and this is the decision thereon.
 
 
 11
 The Commissioner argues here, as he did before the Tax Court, that where the parties to a transaction involving the sale of a business have entered into a written agreement spelling out the precise amount to be paid for a covenant not to compete, they should not then be permitted, for tax purposes, to attack such provision except in cases of fraud, duress or undue influence.
 
 
 12
 The taxpayers counter by saying that such an approach would dignify form at the expense of substance and that the substance of this transaction, as found by the Tax Court, shows that the amounts allocated in the agreements for the covenants had no independent basis in fact or arguable relationship with business reality.
 
 
 13
 We address ourselves to the soundness of the rule contended for by the Commissioner because we are satisfied that if it is basically not acceptable then the factual findings of the Tax Court would compel us to affirm its decision in favor of these taxpayers. We say this because we think we could not, on this record, disturb the Tax Court's findings that the covenants were not fully restrictive in view of the wording and also because these particular stockholders were not realistically in a position to compete. In contrast, if the Commissioner's proposed rule is accepted, the factual findings of the Tax Court would require us to reverse its decision. This is so because after Thrift first evidenced its intention to make an allocation to the covenants not to compete the taxpayers has almost two weeks in which to investigate the tax consequences. Novertheless, they entered into the agreement on the advice of their own counsel. The present record does not reveal that the taxpayers lacked a full understanding of the terms of the agreement or that the purchaser engaged in fraud, duress, or undue influence. We do not understand either the Tax Court or the dissent to view the facts any differently.
 
 
 14
 We note at the outset that it is almost as important to delineate some of the matters which are not before us as it is to determine the applicable legal principle. First, since we are dealing with an issue as to the applicability of the correct legal principle, we are not concerned with the 'clearly erroneous' rule. Compare Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). 'The question here is not one of 'fact,' but consists rather of the legal standard required to be applied to the undisputed facts of the case.' United States v. General Motors Corp., 384 U.S. 127, 141, 86 S.Ct. 1321, 1328, 16 L.Ed.2d 415 (1966).
 
 
 15
 Next, we are not here involved with a situation where the Commissioner is attacking the transaction in the form selected by the parties, e.g., Schulz v. C.I.R., 294 F.2d 52 (9th Cir. 1961). Where the Commissioner attacks the formal agreement the Court involved is required to examine the 'substance' and not merely the 'form' of the transaction. This is so for the very good reason that the legitimate operation of the tax laws is not to be frustrated by forced adherence to the mere form in which the parties may choose to reflect their transaction. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed 596 (1935); C.I.R. v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945). In contrast, the Commissioner here is attempting to hold a party to his agreement unless that party can show in effect that it is not truly the agreement of the parties. And to allow the Cimmissioner alone to pierce formal arrangements does not involve any disparity of treatment because taxpayers have it within their own control to choose in the first place whatever arrangements they care to make.
 
 
 16
 We turn, then, to a consideration of the principle advanced by the Commissioner. We begin by noting that the determination as to whether a covenant not to compete was actually executed is important, taxwise, both to the buyer and the seller. A tax challenge aside, the amount a buyer pays a seller for such a covenant, entered into in connection with a sale of a business, is ordinary income to the covenantor and an amortizable item for the covenantee. Ullman v. Commissioner of Internal Revenue, 264 F.2d 305 (2nd Cir. 1959). Indeed, the presumed tax consequences of the transaction may, as here, help to determine the total amount a purchaser is willing to pay for such a purchase. Therefore, to permit a party to an agreement fixing an explicit amount for the covenant not to compete to attack that provision for tax purposes, absent proof of the type which would negate it in an action between the parties, would be in effect to grant, at the instance of a party, a unilateral reformation of the contract with a resulting unjust enrichment. If allowed, such an attach would encourage parties unjustifiably to risk litigation after consummation of a transaction in order to avoid the tax consequences of their agreements. And to go behind the agreement at the behest of a party may also permit a party to an admittedly valid agreement to use the tax laws to obtain relief from an unfavorable agreement.
 
 
 17
 Of vital importance, such attacks would nullify the reasonably predictable tax consequences of the agreement to the other party thereto. Here the buyer would be forced to defend the agreement in order to amortize the amount allocated to the covenant. If unsuccessful, the buyer would lose a tax advantage it had paid the selling-taxpayers to acquire. In the future buyers would be unwilling to pay sellers for tax savings so unlikely to materialize.
 
 
 18
 Finally, this type of attack would cause the Commissioner considerable problems in the collection of taxes. The Commissioner would not be able to accept taxpayers' agreements at face value. He would be confronted with the necessity for litigation against both buyer and seller in order to collect taxes properly due. This is so because when the Commissioner tries to collect taxes from one party he may, as here, dispute the economic reality of his agreement. When the Commissioner turns to the other party, there will likely be the arguments that the first party, as here, received consideration for bearing the tax burden resulting from the sale and that the covenants did indeed have economic reality.
 
 
 19
 For these reasons we adopt the following rule of law: a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. Because of the importance of our conclusion as to the proper rule of law here applicable, we deem it appropriate to consider other cases which have been decided in this particular field.
 
 
 20
 We first consider the case law in this Circuit. The first was Mathews v. C.I.R., 311 F.2d 795 (1963). This was a per curiam opinion filed in January 1963. It affirmed the decision of the Tax Court without discussion.[4] In that case the sole stockholder sold the corporate stock and assets for a fixed consideration and also agreed to execute a covenant not to compete for a stipulated additional amount. In his tax return the selling-taxpayer attempted to treat the payment for the covenant as a payment for a capital asset rather than ordinary income. The Commissioner challenged such treatment and the Tax Court apparently decided that petitioner did not sustain the required burden for upsetting the allocation in that it found that the covenant had independant substance which could be equated with the payment therefor. The rule here advanced was apparently nor raised.
 
 
 21
 The second case in this Circuit is Levine v. C.I.R., 324 F.2d 298 (1963). There the agreement, which included covenants not to compete, recited that in computing the purchase price an explicitly stated valuation was placed on the covenants. The selling partners (taxpayers) apparently did not consider any of such proceeds as payment for the covenants because they did not report any part as ordinary income for tax purposes. The Cimmissioner claimed that it was all paid for the convenant. The Tax Court found as an ultimate fact that half of the amount was paid for good will and half for the covenant. See 21 T.C.M. 363.
 
 
 22
 In the review proceedings, this Court was apparently not confronted with the contention here advanced that the taxpayer should be held to the allocation set forth in the agreement because of the wording of the agreement itself. Rather, the Court in affirming concerned itself solely with the question of the propriety of the Tax Court's allocation as between good will and the covenant not to compete.
 
 
 23
 In turning to other Circuits we find that one of the leading cases is the Second Circuit opinion in Ullman v. C.I.R., 264 F.2d 305 (1959). There the selling-taxpayers, for tax purposes, treated the amounts specifically allocated in their agreements for their covenants not to compete as part of the purchase price for their stock. Before the Tax Court, the Cimmissioner successfully resisted this treatment on the facts, with the consequence that the consideration for the covenant was treated as income. The Second Circuit, in upholding the Tax Court, applied the rule 'that when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration.' 264 F.2d 305, 308.
 
 
 24
 The first case of importance in the Fifth Circuit is Barran v. C.I.R., 334 F.2d 58 (1964). There the Court applied the rule of the Second Circuit in the Ullman case. However, a reading of the second footnote in that case leaves it unclear whether the Court refused to apply the rule we have formulated or merely found it unnecessary to consider it under the facts of that case. Its findings suggest that the latter construction of the footnote is probable. See also Balthrope v. C.I.R., 356 F.2d 28 (5th Cir. 1966); Montesi v. C.I.R., 340 F.2d 97 (6th Cir. 1965).
 
 
 25
 There are several cases in this field decided by the Ninth Circuit. The first is Rogers v. United States of America, 290 F.2d 501 (1961). There the Court affirmed the action of the trial court in refusing the covenantor's request to go behind the covenant and the consideration allocated thereto. Explicit reliance was placed on Hamlin's Trust v. Commissioner of Internal Revenue, 209 F.2d 761 (10th Cir. 1954), which we shall later consider. The Court noted that 'Third parties may question the resolutions of parties to a contract, but in the absence of fraud it is not ordinarily open to the bargainers to do so.' 290 F.2d 501.
 
 
 26
 The case of Schulz v. C.I.R., 294 F.2d 52 (9th Cir. 1961), is inapplicable because cause the attack on the consideration received for the covenant was made by the Commissioner.
 
 
 27
 The next Ninth Circuit case is Annabelle Candy v. C.I.R., 314 F.2d 1 (1962). In that case the execution of a covenant was required by the terms of the agreement but no specific amount was allocated to the covenant on the face of the writing. There the taxpayer-purchaser was attempting to make an allocation for tax purposes, in contrast to the reverse situation here where the taxpayers are attempting to dispute an allocation for tax purposes. It is of moment to note that in the opinion the Court stated as follows:
 
 
 28
 'In the purchase agreement involved in the case before us, there is no allocation of consideration to the covenant not to compete. While this is pretty good evidence that no such allocation was intended it is not conclusive on the parties as would be the case if there had been an express affirmance or disavowal in the agreement.' 314 F.2d 1, 7.
 
 
 29
 Thus, while the case is distinguishable from the situation involved here, the Court appears to suggest the same approach to the tax determination process that we have adopted.
 
 
 30
 The last Ninth Circuit case is Yandell v. United States of America, 315 F.2d 141 (1963). There the Court upheld the trial court's decision that the written agreement concerning a covenant not to compete with a stipulated consideration therefor was binding on the covenantor for tax purposes. The Court noted that it did not have to consider the applicability of the rule here advanced.
 
 
 31
 We come finally to the important Tenth Circuit Court opinion in Hamlin's Trust v. C.I.R., 209 F.2d 761 (1954). The Commissioner places heavy reliance on this opinion in the present petitions for review. The Hamlin case arose in the same way as the cases now before us except that the Tax Court found that the amount allocated in the agreement for the covenants not to compete was to be treated as ordinary income. On review, in affirming the Tax Court, the Court held the taxpayers to their agreement despite some evidence which was quite similar to that found here.
 
 
 32
 We interpret the language of the Hamlin's Trust case as reflecting in substance the principle here espoused even though we concede that the evidence may have called for the same result no matter what the rule.
 
 
 33
 By way of generalization, we note that in none of the cases discussed in which the taxpayer attacked the formal agreement was there any factual situation which warranted a finding, apart from the writing, that the taxpayer had sustained his burden of strong proof. However, we are here confronted with that very situation because of the factual findings of the Tax Court which we accept. Even in these circumstances, we are inclined to believe that the 'strong proof' rule would require that the taxpayer be held to his agreement absent proof of the type which would negate it in an action between the parties to the agreement. If our belief is unwarranted then we nevertheless conclude that a taxpayer who enters into a transaction of this type to sell his shares and executes a covenant not to compete for a consideration specifically allocated to the covenant may not, absent a showing of fraud, undue influence and the like on the part of the other party, challenge the allocation for tax purposes. We so conclude even though the evidence, as here, would support a finding that the explicit allocation had no independent basis in fact or arguable relationship with business reality. Such evidence can have no independent legal significance in cases where the consideration is allocated by the parties in their agreement. It would be relevant, but not conclusive, evidence only if some attack is made on the written agreement by a party claiming that because of fraud, etc., it is not his conscious agreement.
 
 
 34
 If it is assumed that the taxpayers were unaware of the tax consequences when they consciously accepted the allocation to the covenants not to compete-- although the Tax Court did not make a finding to that effect-- the following observations from Hamlin's Trust v. C.I.R., 209 F.2d 761, 765 (10th Cir. 1954), are pertinent:
 
 
 35
 '* * * It is true that there was very little discussion of the suggested allocation (to the covenant not to compete). But the effectiveness taxwise of an agreement is not measured by the amount of preliminary discussion had respecting it. It is enough if parties understand the contract and understandingly enter into it. The proposed change in the contract was clear. All parties participating in the conference agreed to it. The owners of stock present signed the written contract at the time and others signed it later. It is reasonably clear that the sellers failed to give consideration to the tax consequences of the provision, but where parties enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences. While acting at arm's length and understandingly, the taxpayers agreed without condition or qualification that the money received should be on the basis of $150 per share for the stock and $50 per share for the agreement not to compete. Having thus agreed, the taxpayers are not at liberty to say that such was not the substance and reality of the transaction.'
 
 
 36
 In any event, it is not improbable that the selling-taxpayers in the end would have entered into such an agreement even though they fully understood the tax consequences of the allocation. This is so because had they insisted on elimination of the covenants not to compete Thrift would not have offered them as high a purchase price for their stock.
 
 
 37
 There are of course a few circumstances in which taxpayers have been permitted to escape taxation based on their own conscious agreements. In Helvering v. F. & R. Lazarus & Co., 308 U.S. 252, 60 S.Ct. 209, 84 L.Ed. 226 (1939), the Supreme Court noted that one who must 'bear the burden of exhaustion of capital investment' is entitled to a deduction for depreciation regardless of the fact that the taxpayer by agreement designated another as the legal owner. Similarly, in Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed 1947 (1947), the Supreme Court stated that 'in the application of social legislation' such as the Social Security Act, 'it is the total situation that controls' liability for employment taxes regardless of the fact that the taxpayer by agreement designated itself as the employer.
 
 
 38
 In contrast, in the present situation there is no discernible policy which would require that the incidence of taxation fall upon a particular individual. As a result of the circumstances that an amount allocable to a covenant not to compete is amortizable by the buyer and ordinary income to the seller, it generally does not matter what amount is allocated. And where a loss of tax revenues from one taxpayer cannot be retrieved entirely from another because of differentials in tax brackets or other factors the Commissioner may challenge the allocation as not reflecting the substance of the transaction.
 
 
 39
 We find, therefore, no reason why the Commissioner may not treat as ordinary income of the taxpayers that part of the total consideration which was explicitly allocated to covenants not to compete with the buyer. Of course, it would be unfair to assess taxes on the basis of an agreement the taxpayer did not make. Compare Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 57 S.Ct. 569, 81 L.Ed. 755 (1937). Many factors may be relevant to the search for the agreement which the parties consciously made, including the business reality of the transaction. However, under the rule here adopted, if either of the parties to a covenant not to compete attempted, in an action against the other, to avoid or alter the agreement he would have a heavy burden of showing fraud, duress, undue influence and the like under what may loosely be called common-law principles. In such a situation the parol evidence rule could come into play to restrict the type of evidence the attacking party might adduce. Thus, a question arises whether this contemplated application of the parol evidence rule is precluded in tax controversies.
 
 
 40
 First, 26 U.S.C. 7453 of the Internal Revenue Code makes applicable the District of Columbia rules of evidence in Tax Court proceedings. However, even if parol evidence would be admissible in a District of Columbia tax case like the present, the statute would not make such a rule controlling here because under the modern view the parol evidence rule is a rule not of evidence but of subseantive law. 3 Corbin on Contracts, Sec. 573.
 
 
 41
 Second, there is language in some federal tax cases to the effect that the parol evidence rule does not apply to controversies between the Commissioner and a party to the contract. Landa v. C.I.R., 92 U.S.App.D.C. 196, 206 F.2d 431 (1953); Scofield v. Greer, 185 F.2d 551 (5th Cir. 1950). But we prefer that the Commissioner may assert the tht the Commissioner may assert the parol evidence rule in circumstances such as the present.
 
 
 42
 'That by some other form of instrument the rights of the United States would have been different is beside the question. The parties abide by this instrument as they made it. The law, and not their wish or understanding, must control its legal effect on the incidence of taxation.' Pugh v. C.I.R. 49 F.2d 76, 79 (5th Cir. 1931).
 
 
 43
 See also Sherman v. C.I.R., 76 F.2d 810 (9th Cir. 1935); Jurs v. C.I.R., 147 F.2d 805 (9th Cir. 1945); Gaylord v. C.I.R., 153 F.2d 408 (9th Cir. 1946); C.I.R. v. Dwight's Estate, 205 F.2d 298 (2nd Cir. 1953); Campbell v. Lake, 220 F.2d 341 (5th Cir. 1955); Clark v. United States, 341 F.2d 691 (9th Cir. 1965).
 
 
 44
 Even if the parol evidence rule were not applicable in tax controversies of the type under consideration, examination of all the evidence adduced in this case reveals nothing to demonstrate that the contract as written was not the taxpayers' conscious agreement.
 
 
 45
 Therefore, the decision of the Tax Court which disallowed the Commissioner's assessments must be vacated. The case is remanded to the Tax Court so that the parties may be afforded a further opportunity to produce evidence in accordance with the principles expressed in this opinion.
 
 
 46
 STALEY, Chief Judge (dissenting).
 
 
 47
 The majority of this court adopts an arbitrary rule of exclusion to be applied in tax cases. Both the Commissioner and the majority admit that it is a new rule. To achieve its result, the majority has had to overrule not only a long line of decisions of this court, but, in my view, has disregarded a long line of decisions of the United States Supreme Court holding to the contrary. It admits, as it must, that there is no judicial precedent for its decision.
 
 
 48
 Since Eisner v. Macomber, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, the United States Supreme Court has consistently held 'In order, therefore, that the clauses cited from article 1 of the Constitution may have proper force and effect, save only as modified by the amendment, and that the latter also may have proper effect, it becomes essential to distinguish between what is and what is not 'income,' as the term is there used; and to apply the distinction, as cases arise, according to truth and substance, without regard to form.' Id. at 206, 40 S.Ct. at 193. That case was decided in 1919. This was reiterated in Weiss v. Stearn, 265 U.S. 242, 253, 44 S.Ct. 490, 68 L.Ed. 1001 (1924), and the Court stated that 'Questions of taxation must be determined by viewing what was actually done, rather than the declared purpose of the participants; and when applying the provisions of the Sixteenth Amendment and income laws enacted thereunder we must regard maters of substance and not mere form.' 265 U.S. at 254, 44 S.Ct. at 492.
 
 
 49
 Again in Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), the Court went behind a formal compliance with the tax-free reorganization provisions, stating that 'To hold otherwise would be to exalt artifice above reality and to deprive the statutory provision in question of all serious purpose.' Id. at 470, 55 S.Ct. at 268. The very next year in Helvering v. Tex-Penn Oil Co., 300 U.S. 481, 57 S.Ct. 569, the Supreme Court affirmed the judgment of this circuit, 83 F.2d 518 (C.A.3, 1936), that the recitals of a written contract could be rebutted by extraneous evidence if necessary to show the real agreement; indeed '* * * in determining tax liability, taxing authorities must look through form to fact and substance.' 300 U.S. at 492-493, 57 S.Ct. at 574, quoting 83 F.2d at 522.
 
 
 50
 Later in Helvering v. F. & R. Lazarus & Co., 308 U.S. 252, 60 S.Ct. 209 (1939), the Court said 'In the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding.' Id. at 255, 60 S.Ct. at 210. The rule of these cases has been applied in hundreds of other cases and by all courts of appeals.[1]
 
 
 51
 Although citing no authority, the majority asserts that the obligation to ascertain the substance of a transaction does not apply in this case because here it is one of the parties rather than the Commissioner who seeks to show that the substance of the transaction differed from its form. This proposition does not follow from the cases; in both Helvering v. F. & R. Lazarus, supra, and Helvering v. Tex-Penn Oil Co., supra, the victorious taxpayers had attacked the form in which the transactions were cast, and the Commissioner had relied on the formal arrangement.[2]
 
 
 52
 Indeed the very question presented here was directly passed upon by the Supreme Court in Bartels v. Birmingham, 332 U.S. 126, 67 S.Ct. 1547 (1947). There the Court of Appeals for the Eighth Circuit had held that although '* * * such a contract was not binding on the Government, they thought it was binding on the parties and would control liability for employment taxes if the Bureau of Internal Revenue chose to accept the arrangement as valid.' 332 U.S. at 129, 67 S.Ct. at 1549. The Court went on to say
 
 
 53
 '* * * The argument of respondents (the Commissioner) to support the administrative interpretation of the regulations is that the Government may accept the voluntary contractual arrangements of the amusement operators and entertainers to shift the tax burden from the band leaders to the operators. Cases are cited to support this position. All of these cases, however, involve the problem of corporate or association entity. They are not pertinent upon the question of contracts to shift tax liability from one taxpayer to another wholly distinct and disconnected corporation or individual. We do not think that such a contractual shift authorizes the Commissioner to collect taxes from one not covered by the taxing statute.' 332 U.S. at 131-132, 67 S.Ct. at 1550. That the rule for which the Cimmissioner sought the Supreme Court's approval in Bartels is precisely the rule which the majority has adopted today is clearly pointed up by the dissent in Bartels, where it was contended that 'If the Government chooses to accept the contract on its face, the parties should be barred from showing that it conceals the real arrangement.' 332 U.S. at 133, 67 S.Ct. at 1551. The majority would distinguish Bartels on the ground that it involved social security taxes, but the entire basis of the decision, as pointed out above, was the long-established rule of looking to substance rather than form, which is applicable to all tax cases and certainly to income tax cases. See cases supra.
 
 
 54
 Section 7453 of the Internal Revenue Code of 1954, 26 U.S.C. 7453 (1955) provides in part: 'The proceedings of the Tax Court and its divisions shall be conducted * * * in accordance with the rules of evidence applicable in trials without a jury in the United States District Court of the District of Columbia.' This section is the successor to 907(a) of the Act of 1926, 44 Stat. at 107, incorporated in the United States Code at Section 611, and re-enacted in the 1939 Code as Section 1111. After 1926, and as enacted in 1939, this section provided that the proceedings before the Board of Tax Appeals should be conducted '* * * in accordance with the rules of evidence applicable in the courts (of equity) of the District of Columbia.' The omission of the reference to equity rules in the 1954 version of the section was merely to modernize the rule, especially to bring it into conformity with the procedural merger of law and equity accomplished under the Federal Rules of Civil Procedure.
 
 
 55
 I think that this court is bound by this section of the statute and must look to the District of Columbia for its laws as to the admissibility of the evidence offered by the taxpayers in this case. The purpose of Section 7453 and its predecessors was to avoid exactly what has occurred in this case by reason of the majority opinion; that is that the several circuits were to be precluded from adopting their own rules for tax cases and thus create conflicting rules. The majority attempts to avoid the thrust of the statute by holding that the parol evidence rule is a rule of substantive law and not a rule of evidence. We need not to into the semantical problem, compare McCormick, Evidence 210 (1954) with Corbin, Contracts 573 (1960) and Restatement, Contracts 237 (1932), because whether it be one or the other, the statute covers it. As the Supreme Court held in Helvering v. F. & R. Lazarus & Co., '* * * Congress has specifically emphasized the equitable nature of proceedings before the Board of Tax Appeals by requiring the Board to act 'in accordance with the rules of evidence applicable in courts of equity of the District of Columbia.' 26 U.S.C. 611.' 308 U.S. at 255, 60 S.Ct. at 210.
 
 
 56
 We have taken cognizance of this provision of the Code in the past and have even gone so far as to apply an Erie R.R.-type extrapolation as to how the District of Columbia courts would decide a particular issue. Masters v. C.I.R., 243 F.2d 335, 338-339 (C.A.3, 1957). The District of Columbia rule to be applied here is clear. In Lands v. C.I.R., supra, where the court held that the taxpayer could introduce extraneous evidence to attack the written documents, it stated:
 
 
 57
 '* * * Generally, 'in the field of taxation, administrators of the laws, and the courts, are concerned with substance and realities, and formal written documents are not rigidly binding.' The taxpayer as well as the Commissioner of Internal Revenue is entitled to the benefit of this rule.' 206 F.2d at 432.
 
 
 58
 Thus, the cardinal maxim of equity that equity looks to substance, not to form, has been imported into tax jurisprudence by the United States Supreme Court in numerous cases, supra, and forms part of the body of equitable rules of admissibility of the District of Columbia, Landa, supra, which we are obligated to apply in the tax cases under 7453. By finding that the taxpayers extraneous evidence has no independent legal significance, the majority not only disregards law as settled by the Supreme Court, but also an explicit command of Congress.[3]
 
 
 59
 The policy basis of the majority seems to be that allowance of the attack on the consideration allocated to the covenant may cause the promisee to '* * * lose a tax advantage it had paid the selling-taxpayers to acquire.' However, as I read this, it opens the door wide for individuals to avoid tax consequences by artifices such as we have in this case. This result is an invitation to tax evasion. As was said of contracts to shift the tax liability from one taxpayer to another in the Bartels case, 'We do not think that such a contractual shift authorizes the Commissioner to collect taxes from one not covered by the taxing statute.' 332 U.S. at 132, 67 S.Ct. at 1550. As was stated in the second Landa opinion, 'Whenever taxation is allowed to depend upon form, rather than substance, the door is opened wide to distorions of the tax laws which, after all, represent the legislative judgment for an equitable distribution of the tax burden generally.' 93 U.S.App.D.C. 265, 211 F.2d 46, 50 (1954).
 
 
 60
 The danger of distortion of the tax laws is particularly acute in this area. As noted by the majority, since the 'amount allocable to a covenant not to compete is amortizable by the buyer and ordinary income to the seller, it generally does not matter what amount is allocated.' The majority would have the Commissioner Attack such an allocation only where the Government would suffer a net loss in revenue, apparently disregarding in all other cases the question whether the allocation was an artifice without '(arguable) independent basis in fact or arguable relationship with business reality,' the test heretofore applied by the various circuits and the Tax Court and the Supreme Court. The difficult burden of showing fraud, etc. placed upon the parties by the majority virtually insures that knowledgeable buyers will engage in questionable and sharp dealing to secure the advantages of such covenants, and the majority's rule will shield their agreements. I cannot condone this invitation given by the majority.
 
 
 61
 The unfairness of the application of the new doctrine to this particular case can best be indicated by reciting the argument advanced by the taxpayers. 'Although the Court has not asked to be briefed on the point, attention must be directed to the inherent unfairness of permitting the Commissioner to cast doubt on the admissibility of parol evidence in his post-hearing breif, where he has failed to object to its admissibility when offered. Not only is time wasted by this procedural irregularity, but Respondents are prejudiced in that the evidence which they offered without objection of the Commissioner supported their basic theory of the case. Had Respondents been put on notice of the Commissioner's position, they could well have devoted their efforts to proving fraud, mistake, or undue influence, which are recognized by the Commissioner as exceptions to the parol evidence rule.'
 
 
 62
 The taxpayers, at the hearing in the Tax Court, relied upon the rule that has prevailed since Eisner v. Macomber, and the Tax Court itself relied upon the rule. As pointed out by the Tax Court, the rule it applied in these cases was that that court would not restrict itself to the written documents but would give great weight to them, so that the burden was upon the taxpayers to adduce 'strong proof' to establish that the allocations of purchase price to the covenants did not reflect the substance of the agreement entered into by the parties. 44 T.C. 549, 555-56 (1965). It is notable that most of the cases relied upon by the Tax Court and cited by the majority purport to apply this same rule.
 
 
 63
 Even a casual reading of the record in this case indicates that a strong case can be made out for the taxpayers based upon fraud. The majority has stated that if it were not for this new rule, the factual findings of the Tax Court would compel this court to affirm the judgment in the taxpayer's favor.
 
 
 64
 I would affirm the Tax Court.
 
 
 65
 KALODNER and WILLIAM F. SMITH, Circuit Judges, join in this dissent.
 
 
 
 [1]
 The several taxpayers here involved kept their books and filed their income tax returns on a calendar year basis for 1959, the tax year here involved
 
 
 [2]
 The Tax Court found as a fact that 'Thrift decided to offer the stockholders of Butler Loan the book value of its assets plus 6 times excess earnings as an inducement to sell. This sum ($60,000) was divided by 55 per cent to reflect the tax effects which would accrue to Thrift if the amount were amortizable by them.' 44 T.C. 549, 552 (1965). The Tax Court noted that '$60,000 / 55% = $109,000. An official of Thrift testified that it was that company's policy to offer slightly less than the maximum amount in initial negotiations.' Idem
 
 
 [3]
 Thrift amortized that part of the payment which had been allocated to the covenant not to compete and the Commissioner has preserved his position with respect to that matter, presumably pending this determination
 
 
 [4]
 It cites the Tax Court opinion as appearing in 36 T.C. 483, whereas it is found in 20 T.C.M. 1565
 
 
 [1]
 See e.g., Palmer v. C.I.R., 354 F.2d 974, 975 (C.A.1, 1965); Lubin v. C.I.R., 335 F.2d 209, 213 (C.A.2, 1964); Ruoff v. C.I.R., 277 F.2d 222, 229 (C.A.3, 1960); Meiselman v. C.I.R., 300 F.2d 666, 668 (C.A.4, 1962); Cotnam v. C.I.R., 263 F.2d 119, 122, 124, 70 A.L.R.2d 1035 (C.A.5, 1959); Broughton v. C.I.R., 333 F.2d 492, 495 (C.A.6, 1964); Sherwood Memorial Gardens v. C.I.R., 350 F.2d 225, 228 (C.A.7, 1965); Schoenberg v. C.I.R., 302 F.2d 416, 418-419 (C.A.8, 1962); Shaw Constr. Co. v. C.I.R., 323 F.2d 316, 319-320 (C.A.9, 1963); Lacy v. C.I.R., 341 F.2d 54, 56-57 (C.A.10, 1965); Landa v. C.I.R., 92 U.S.App.D.C. 196, 206 F.2d 431, 432 (1953); Sheppard v. United States, 361 F.2d 972, 977-979 (Ct.Cl., 1966)
 
 
 [2]
 See e.g., Frelbro Corp. v. C.I.R., 315 F.2d 784, 786 (C.A.2, 1963); Landa v. C.I.R., supra, discussed infra
 
 
 [3]
 Although I do not ground my dissent on these bases, it should be noted that even were the parol evidence rule applicable in these cases, it should not be applied here because it is always open to the parties to show that the true consideration for the agreement was other than that recited in the written contract. The Tax Court, this court and others have recognized this exception. In Haverty Realty & Inv. Co., 3 T.C. 161, 167 (1944), it was said that:
 "* * * the recitals of a written instrument as to the consideration received are not conclusive, and it is always competent to inquire into the consideration and show by parol or other extrinsic evidence what the real consideration was.' Deutser v. Marlboro Shirt Co. (C.C.A., 4th Cir.), 81 Fed. (2d) 139, 142, citing many authorities.'
 See also, Richards v. Boyd, 344 F.2d 754 (C.A.3, 1965); Diesel Heat & Power, Inc. v. Dixon Marine Indus. Power Transmission, Inc., 232 F.2d 217 (C.A.5, 1956); Patterson v. Texas Co., 131 F.2d 998, 1000-1001 (C.A.5, 1942), cert. denied, 319 U.S 761, 63 S.Ct. 1318, 87 L.Ed. 1712 (1943). It is also generally well settled that a third party cannot assert the parol evidence rule. E.g., Bardwell v. C.I.R., 318 F.2d 786, 790 (C.A.10, 1963), aff'g 38 T.C. 84, 90 at n. 2 (1962); Thorsness v. United States, 260 F.2d 341, 345 (C.A.7, 1958); Landa v. C.I.R., supra; Scofield v. Greer, 185 F.2d 551, 552 (C.A.5, 1950); Haverty Realty & Inv. Co., 3 T.C. 161, 167 (1944) and cases cited therein.