LEONARD E. TREISTER AND DIANA TREISTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Treister v. Commissioner
Docket No. 16043-79.
United States Tax Court
T.C. Memo 1986-53; 1986 Tax Ct. Memo LEXIS 552; 51 T.C.M. (CCH) 418; T.C.M. (RIA) 86053; February 6, 1986. *552 Prior to the years in issue, P served as chief executive officer, president and chairman of the board of HCA, a corporation involved in certain government-sponsored turnkey housing projects. In August, 1973, P resigned from these positions. Contemporaneously with his departure from HCA, A agreed to purchase P's HCA stock for $225,000 and to pay compensation of $75,000 to P for his availability for consulting services. During the years in issue, P received payments totaling $75,000 from A. Held, P received the payments in issue as compensation for his availability for consulting services rather than as additional consideration for his HCA stock. James E. Burk and Sam Konigsberg, for the petitioners. Kevin J. Yourman, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined deficiencies of $12,492 and $8,077 in petitioners' 1975 and 1976 Federal income tax returns, respectively. The sole issue for decision is whether petitioner received certain payments during 1975 and 1976 as compensation for services or in exchange for certain stock. FINDINGS OF FACT Some of the facts have been stipulated *553 and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Leonard E. Treister (petitioner) and Diana Treister, husband and wife, resided in North Miami, Florida, when they filed the petition in this case. Sometime prior to December 26, 1968, petitioner, an attorney, together with his brother Kenneth Treister (Ken), an architect, formed Lenken Corporation (Lenken). Petitioner and Ken each received 50 percent of Lenken's issued and outstanding common stock. On December 26, 1968, Lenken and Alcoa Properties, Inc. (Alcoa), formed Housing Corporation of America (HCA) to participate in certain government-sponsored turnkey housing projects. Lenken and Alcoa received 49 percent (490 shares) and 51 percent (510 shares) of HCA's issued and outstanding common stock, respectively. On the above date, petitioner and Ken each entered into a management agreement with HCA. Pursuant to these agreements, petitioner became the chief executive officer of HCA and Ken became the president of HCA. Petitioner and Ken were also elected to HCA's board of directors. As an employee of HCA, petitioner was in charge of the overall management *554 of the company. Ken, on the other hand, was involved with the technical aspects of the company. On December 31, 1972, Ken and petitioner entered into an agreement with Alcoa and HCA which provided, in pertinent part, as follows: SALE AND TRANSFER OF STOCK
Section 3.1. KENNETH agrees to obtain by way of redemption of his stock of LENKEN, and to sell to API, and API agrees to purchase from KENNETH on January 4, 1973, 245 of the Common Shares of HCA (par value ten dollars per share) for a consideration of $225,000, payable in cash upon delivery of certificates for such Shares properly endorsed for transfer to API, free and clear of liens, claims and encumbrances. KENNETH and LEONARD agree to take such steps as are necessary and appropriate to effectuate the transfer of such Shares by LENKEN to KENNETH, for sale to API. Closing of the sale of stock by KENNETH to API shall be held at the office of HCA in Miami, Florida. On the above date, Ken and HCA also entered into a written "Agreement for Services" which provided that Ken, at HCA's request, would perform certain architectural services with respect to certain projects identified in the service agreement. The service *555 agreement further provided that Ken would receive compensation of $75,000 for his availability for consulting services. On or about December 31, 1972, the Lenken stock owned by Ken was redeemed for 245 shares of HCA stock. [1] Ken then sold the HCA stock he received in the redemption to Alcoa for $225,000. On January 4, 1973, Ken resigned as president of HCA and as a member of HCA's board of directors. On that same date, petitioner and HCA entered into a written "Amended Management Agreement" which provided for petitioner's employment by HCA as its president and chief executive officer through December 31, 1974, at an annual salary of $75,000. Also on January 4, 1973, Alcoa and petitioner entered into a written "Agreement" (hereinafter sometimes referred to as the January 4 agreement) granting to petitioner an option, which was exercisable after December 31, 1974, to require Alcoa to purchase for $225,000 the HCA stock owned by Lenken. The agreement further provided that if petitioner exercised this option, Alcoa would cause HCA to enter into an agreement with petitioner "for services (not to exceed 10% *556 of his available working time) for a period of 18 months, as compensation for which HCA shall pay to LEONARD the sum of $75,000, payable in equal installments at the end of the sixth, twelfth and eighteenth months." Sometime prior to August 8, 1973, peitioner was asked to resign as president and chief executive officer of HCA. On or about August 8, 1973, petitioner traveled to California to discuss his departure from HCA with Robert Hatfield (Hatfield), the president of Alcoa. During the course of this discussion, Hatfield and petitioner decided to modify the "Agreement" and the "Amended Management Agreement" dated January 4, 1973. To evidence the terms of the new agreement, the two men composed a letter dated August 8, 1973 (the August 8 agreement), which was addressed to petitioner from Alcoa, providing in pertinent part as follows: * * * 2. Leonard will remain in the employ of HCA and/or API as a consultant on corporate matters (but shall be relieved of any obligation to perform executive and/or management tasks or duties) until December 31, 1974, and thereafter for an additional eighteen (18) months in accordance with Paragraph 2 of the Agreement. * * * 4. During *557 the eighteen month period of employment following December 31, 1974, Leonard will perform consulting services not to exceed ten percent (10%) of his available working time, and as compensation for which HCA shall pay to Leonard the sum of Seventy Five Thousand Dollars ($75,000.00), payable in equal installments at the end of the sixth (6th), twelfth (12th) and eighteenth (18th) months. API will guarantee to Leonard the payment by HCA of compensation payable to Leonard under such agreement, not to exceed in the aggregate the sum of $75,000.00. * * * 6. API will purchase for the sum of Two Hundred Twenty Five Thousand Dollars ($225,000.00) all of the stock of HCA (245 common shares) now owned by Lenken Corporation (controlled by Leonard). The purchase price will be paid in cash within thirty (30) days from the date hereof against delivery to API of said shares free and clear of all liens, claims and encumbrances and endorsed or otherwise transferable to API. * * * 9. This agreement, taken in conjunction with the Agreement and Amended Management Agreement, copies of which are attached hereto as Exhibits A and B, shall constitute the entire understanding among the parties with *558 respect to the subject matter hereto, superseding all negotiations and prior discussions. In the event there is a conflict between the terms of this agreement and the terms of the Agreement or the Amended Management Agreement, the terms of this agreement shall govern. This agreement shall not be altered, modified or amended except by a later writing duly executed by all the parties hereto. This agreement shall not be effective or valid until it is signed by all of the signatories hereto. The fact that this agreement may be initialled by any of the parties shall not validate it or make it effective. Very truly yours, ALCOA PROPERTIES, INC. By AGREED: HOUSING CORPORATION OF AMERICA
By LENKEN CORPORATION By LEONARD E. TREISTER Petitioner initialled each page of the agreement and also signed the agreement in his individual capacity and on behalf of Lenken. Although Hatfield initialled each page of the agreement, he did not sign the agreement because he wanted an attorney to review the agreement. No representative for Alcoa or HCA signed the agreement. While on an airplane returning to Miami from California, petitioner reviewed the August 8 agreement and made *559 the following notations on the letter. Petitioner circled the word "employment" found in the first line of paragraph 4 and inserted the words "in error" and "call Greg Kerr" in the margin next to paragraph 4. [2] Petitioner also circled the word "compensation" found in the fourth and ninth lines of paragraph 4 and inserted the words "omit" and "additional consideration for LET interest" in the margin adjacent to paragraph 4. Following his return to Miami, petitioner called Mr. Kerr and explained to him that the August 8 agreement should be amended to reflect that the payment of $75,000 was additional consideration for his HCA stock rather than compensation for services. Petitioner, however, could not remember if another agreement was ever executed. In August or September, 1973, petitioner received a payment of $225,000 from Alcoa for his 245 shares of HCA stock. [3] In November, 1974, petitioner left the premises of HCA and returned to a full-time law practice in Miami, Florida. *560 Subsequent to 1974, petitioner's sole contact with HCA was to respond to a subpoena for a deposition. Petitioner performed no significant services for HCA nor was he requested to do so after 1974. During 1975 and 1976, petitioner received payments of $49,974 and $25,000, respectively, from HCA. On Alcoa's consolidated returns for 1975 and 1976, HCA deducted these payments as management fees. On Schedule D attached to their 1975 and 1976 Federal income tax returns, petitioners reportd these amounts as long-term capital gain, treating the payments as additional consideration for petitioner's HCA stock. In the notice of deficiency, respondent determined that petitioner had received these payments as compensation for services and, therefore, should have reported these amounts as ordinary income. On May 13, 1983, petitioner filed a voluntary petition under Chapter 7 of the Bankruptcy Act in the United States Bankruptcy Court for the Southern District of New York. Petitioner was granted a discharge in bankruptcy by order of the bankruptcy court dated October 5, 1983. On March 8, 1985, respondent filed with the bankruptcy court an amended proof of claim which included the 1975 *561 and 1976 Federal income tax claims at issue here. Petitioner subsequently filed a motion with the bankruptcy court requesting that the court declare respondent's 1975 and 1976 claims dischargeable. In In re Treister,    Bankr.    (Bankr. S.D.N.Y. 1985), the bankruptcy court denied petitioner's motion, holding that respondent's 1975 and 1976 income tax claims had not been discharged in bankruptcy. OPINION The issue for decision is whether the payments petitioner received from HCA during 1975 and 1976 constitute additional consideration for his HCA stock or compensation for his availability for consulting services. Petitioners argue that although the form of the payments was compensation for services, the payments, in substance, were additional consideration for petitioner's HCA stock. Respondent disagrees, contending that the form and substance of the payments in issue were compensation for petitioner's availability for consulting services. Respondent relies on the application of the "mistake, undue influence, fraud, duress, etc." rule of Commissioner v. Danielson,378 F.2d 771 (3rd Cir. 1967), or the "strong proof" rule of Ullman v. Commissioner,264 F.2d 305 (2d Cir. 1959), *562 affirming 29 T.C. 129 (1957), to support his position. Although we agree that the payments in issue constitute compensation for petitioner's availability for consulting services, we do not think that either Danielson or Ullman is applicable to the facts presented herein. In Danielson, the Third Circuit adopted the following rule of law: [A] party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. [378 F.2d at 775.] In Ullman, the Second Circuit stated that a taxpayer must present "strong proof" that the form of a contract does not reflect its substance before the tax consequences apparent on its face will be disregarded. In both Danielson and Ullman, the taxpayers were attempting to avoid the value assigned in legally enforceable sales contracts to covenants not to compete. In the *563 instant case, however, petitioners are not challenging the terms of a legally enforceable agreement. The January 4 agreement grants to petitioner an option, which was exercisable after December 31, 1974, to require Alcoa to purchase the HCA stock owned by Lenken. This agreement further provides that Alcoa will cause HCA to enter into a service agreement with petitioner if and when he exercises this option. Alcoa, however, purchased petitioner's HCA stock in August or September, 1973, which was prior to the effective date of the option. Consequently, Alcoa did not purchase the HCA stock pursuant to the option and, therefore, Alcoa was not obligated under the January 4 agreement to cause HCA to enter into a service agreement with petitioner. The August 8 agreement is likewise unenforceable. Pursuant to its terms, the August 8 agreement did not become effective until it was signed by all of the signatories thereto. Because Alcoa and HCA were both required signatories to the agreement, and representatives for neither company signed the agreement, the agreement, by its terms, is not legally enforceable. *564 Although petitioners do not have to satisfy the Danielson rule or the Ullman rule to prevail in this case, they nevertheless bear the burden of proving by a preponderance of the evidence that the substance of the transaction differed from its form. Rule 142(a). [4] After a careful review of the facts before us, we find that petitioners have failed to satisfy this burden. The record clearly establishes and petitioners do not dispute that the payments, in form, were compensation for petitioner's availability for consulting services. The August 8 agreement provided that Alcoa would pay cash of $225,000 for the HCA stock owned by Lenken within 30 days of the date of the agreement. The agreement further provided that petitioner would receive compensation of $75,000 for his availability for consulting services, which was payable in equal installments at the end of the sixth, twelfth and eighteenth months following his departure from the company on December 31, 1974.In August or September, 1973, as provided in the August 8 agreement, petitioner received a payment of $225,000 *565 for his HCA stock. Also as provided in this agreement petitioner subsequently received payments of $49,974 and $25,000 from Alcoa in 1975 and 1976, respectively, for his availability for consulting services. Petitioners nevertheless contend that although the form of the payments in issue was compensation for services, the substance of the payments was additional consideration for petitioner's HCA stock. To support their position, petitioners rely on Coven v. Commissioner,66 T.C. 295 (1976). In Coven the taxpayer, who was one of five partners in an accounting firm, decided to withdraw from the accounting firm for medical reasons. Although the taxpayer initially agreed to sell his partnership interest to another partner in the accounting firm, the taxpayer and purchasing partner subsequently entered into a "consultant agreement" which superseded the original sales agreement. The consultant agreement provided that the taxpayer would receive certain cash payments from the purchasing partner as a consultant to the accounting firm. In Coven we disregarded the form of the consultant agreement and found that the taxpayer had, in substance, sold his partnership *566 interest. In so finding we relied on the following factors: (1) Consulting services were to be rendered only at petitioner's convenience, and only if his health and other business commitments permitted; (2) if petitioner and his wife died before 1991, the survivor's estate would receive a lump-sum payment, declining from $204,050 in 1966 to $6,761.30 in 1990. There is accordingly a total lack of correlation--in fact, it would be an inverse ratio--between the services rendered and the amount of these lump-sum payments; (3) payments could continue well after petitioner's death, for the duration of his wife's life, if she survived him; (4) only a few phone calls have been made to petitioner, and no formal consultation services actually have been rendered under the contract; and (5) petitioner did not expect to render consulting services when the agreement was executed. [Footnote omitted. 66 T.C. at 304.] The facts of the instant case are distinguishable from the situation in Coven. First, in Coven the Court found that the taxpayer need only render consuling services at his convenience and only if his health and other business commitments permitted. In the *567 instant case petitioner was expected to render consulting services at the discretion of the management of Alcoa and HCA. Also, as evidenced by the August 8 agreement, petitioner and Alcoa intended that the management of HCA would have access to 10 percent of petitioner's available working time, regardless of his other business commitments. In the absence of evidence to the contrary, we also assume that petitioner's health would not have prevented him from rendering the requested services. In Coven the consultant agreement provided that payments would continue for a period of 25 years in the event the taxpayer or his wife survived for that period of time. In the event the taxpayer and his wife died prior to the expiration of the 25-year period, the survivor's estate would receive a lump-sum payment pursuant to the terms of the consultant agreement. Here, petitioner's obligation to perform consulting services and his right to payment terminated after 18 months. Further, the record contains no evidence suggesting that petitioner, his wife or his estate was entitled to payment of any kind in the event petitioner was unavailable for consulting services. Although petitioner *568 did not actually render consulting services to HCA or Alcoa after December 31, 1974, we are satisfied that petitioner and Hatfield reasonably anticipated that petitioner would render consulting services to the management of HCA after his departure from the company. At trial Hatfield explained that: [Petitioner] having been the chief executive officer of the company, was aware of the various projects that were underway, and as it was obvious that we faced serious litigation in most of these projects, we wanted [petitioner's] expertise and advice and availability to us, during this period of time, as we tried to resolve our problems. Petitioner admitted at trial that he and Hatfield had discussed the inexperience of Alcoa's board of directors with respect to real estate matters and thus the necessity of retaining petitioner's availability for consulting services. Although petitioner further testified that his "intention was to be paid and to leave", the record contains no evidence that he discussed his intention with Hatfield. Indeed, Hatfield stated that petitioner never suggested to him that they characterize the final payment of $75,000 as additional consideration for the *569 HCA stock. Moreover, petitioner signed the August 8 agreement, thus evidencing his intent to render consulting services if requested by HCA's management. We note that petitioner testified that he subsequently discussed modifications to the August 8 agreement with Kerr, an attorney for Alcoa. Petitioner, however, did not present Kerr's testimony at trial. Moreover, petitioner stated at trial that he could not remeber whether a subsequent agreement evidencing his suggested modificatons was ever drafted. We also note that the record establishes and petitioner does not dispute that petitioner's brother, Ken, received $225,000 from Alcoa for his 245 shares of HCA stock. Petitioner nevertheless asks us to find that Alcoa agreed to purchase his 245 shares of HCA stock for $300,000. The record, however, contains no evidence which would support a finding that petitioner's interest in HCA was worth $75,000 more than his brother's interest in the company. Thus, in the absence of evidence to the contrary, we conclude that Alcoa intended to treat petitioner and his brother equally and thus agreed to pay petitioner no more than $225,000 for his HCA stock. Petitioners also argue that Alcoa's *570 failure to withhold the appropriate taxes from the payments in issue establishes that HCA did not consider such payments compensation for services. Initially we note that petitioner presented no evidence corroborating his testimony that Alcoa did not withhold the appropriate taxes from these payments. However, even if we assume that Alcoa did not withhold the appropriate taxes, we do not find this evidence, standing alone, sufficient to establish that the payments in issue constituted additional consideration for petitioner's HCA stock. The testimony of Hatfield, which we found to be credible, candid and forthright, makes it perfectly clear that Alcoa made these payments to petitioner as compensation for his availability for consulting services. The fact that HCA deducted the payments as management fees on Alcoa's 1975 and 1976 consolidated returns corroborates Hatfield's testimony. Consequently, in the absence of more substantial evidence to the contrary, we are satisfied that the August 8 agreement accurately describes the form as well as the substance of the payments in issue. In Commissioner v. National Alfalfa Dehydrating & Milling Co.,417 U.S. 134, 149 (1974), *571 the Supreme Court observed: [W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice * * * and may not enjoy the benefit of some other route he might have chosen to follow but did not. We think this statement accurately addresses the situation presented herein. Although Alcoa and petitioner were free to characterize the payments in issue as consideration for stock, the parties chose to characterize the payments as compensation for services. Having so chosen, petitioner must accept the tax consequence of his choice. On brief, petitioners alternatively argue that respondent's 1975 and 1976 income tax claims were discharged in bankruptcy. However, subsequent to the trial of this case and the filing of briefs by petitioners, in In re Treister,    Bankr.   (Bankr. S.D.N.Y. 1985), the United States Bankruptcy Court for the Southern District of New York entered a final judgment that respondent's 1975 and 1976 income tax claims against petitioners were priority claims and, therefore, *572 not discharged in bankruptcy. [5] Thus, because the parties in the instant case are the same as the parties in the above bankruptcy action, the general principle of res judicata precludes petitioners from again arguing that the tax claims in issue were discharged in bankruptcy. Commissioner v. Sunnen,333 U.S. 591, 597 (1948). Accordingly, respondent's determination is sustained. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. This amount represented one-half of the HCA stock owned by Lenken.↩
2. Greg Kerr was a member of the law firm Eckert, Seamans, Cherin and Mellot in Pittsburgh, Pennsylvania. Mr. Kerr served as outside counsel to Alcoa during the years in issue.↩
3. The record does not disclose when petitioner received legal title to the HCA shares from Lenken.↩
4. Unless otherwise indicated, all rule references are to the Tax Court Rules of Practice and Procedure.↩
5. In In re Saco Local Development Corp.,711 F.2d 441↩ (1st Cir. 1983), the First Circuit held that a bankruptcy court's decision that a creditor's claim was entitled to priority status constituted a final decision.